**Paul A. WRIGHT, on behalf of all similarly situated persons, Plaintiff–Appellant,**

v.

**Chase RIVELAND, Defendant–Appellee.**

No. 97–36074.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 1999

Remanded May 3, 1999

Resubmitted April 12, 2000

Filed July 11, 2000

908

Chris R. Youtz and Jonathan P. Meier, Sirlanni & Youtz, Seattle, Washington, for the plaintiff-appellant.

Douglas W. Carr, Assistant Attorney General, Olympia, Washington, for the defendant-appellee.

Daniel J. Popeo, Paul D. Kamenar, and Richard A. Samp, Washington Legal Foundation, Washington, DC; Paul G. Cassell, University of Utah, Salt Lake City, Utah, for the amici.

Before: PREGERSON and THOMPSON, Circuit Judges, and MOSKOWITZ,[1] District Judge.

MOSKOWITZ, District Judge:

This case involves a challenge to Washington statute RCW 72.09.480 (the "Statute"), which authorizes a deduction of 35% from all funds received by inmates from outside sources. Washington inmate, Paul Wright, on behalf of himself and a class of similarly situated individuals (hereinafter collectively referred to as "the Class") appeals the district court's dismissal of the Class's Due Process and Excessive Fines claims against the Secretary of the Washington Department of Corrections (the "Department").[2] The Class also appeals

1. The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

2. The Washington Legal Foundation, National Organization For Victim Assistance, Citizens For Law And Order, and Justice For All have filed amicus-curiae briefs in support of Defendant–Appellee.

the district court's grant of partial summary judgment in favor of the Department, dismissing the Class's claim that mandatory deductions under the Statute violate § 206(d)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1056(d)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

## BACKGROUND

On October 25, 1996, the Class filed a First Amended Complaint ("Complaint") against the Department challenging the legality of the Statute, which authorizes the taking of deductions from funds received by Washington inmates from outside sources. The Statute provides, in pertinent part:

> When an inmate ... receives any funds in addition to his or her wages or gratuities, the additional funds shall be subject to the deductions in RCW 72.09.111(1)(a)....

Wash. Rev.Code Ann. § 72.09.480(2) (West 1997). RCW 72.09.111(1)(a) authorizes the Secretary to deduct from incoming funds:

> (i) Five percent to the public safety and education account for the purpose of crime victims' compensation;
>
> (ii) Ten percent to a department personal inmate savings account; and
>
> (iii) Twenty percent to the department to contribute to the cost of incarceration.

Wash. Rev.Code Ann. § 72.09.111(1)(a) (West 1997).

The Class challenged the Statute as violating their rights under the Equal Protection, Due Process, Ex Post Facto, Bill of Attainder, Double Jeopardy, Takings, and Excessive Fines Clauses of the United States Constitution. In a claim entitled "Impairment of Other Federal Rights," the Class also alleged that mandatory deductions under the Statute impaired their rights to receive certain federal benefits and funds. The Class sought to have the Statute declared unconstitutional and prayed for the disgorgement and return of any funds with interest that had been wrongly deducted from their accounts.

The Department moved to dismiss each of the Class's claims for violations of constitutional or federal law for failure to state a claim. The district court granted in part the Department's motion and dismissed all of the Class's causes of action except their "Impairment of Other Federal Rights" claim. Subsequently, both parties moved for summary judgment on the remaining claim. The Department also moved to dismiss the Class's Complaint, arguing that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, deprived the district court of subject matter jurisdiction.

The district court denied the Department's motion to dismiss based on lack of subject matter jurisdiction and its motion for summary judgment on the impairment of federal rights claim. Instead, it granted partial summary judgment in favor of the Class and declared the Statute void to the extent that it authorized funds to be deducted from Veteran's Administration benefits received under 38 U.S.C. § 5301(a), Social Security benefits received under 42 U.S.C. § 407(a), proceeds from civil rights actions filed pursuant to 42 U.S.C. § 1983, and certain funds distributed to Native Americans under 25 U.S.C. §§ 410, 1401–07, 1176 and 43 U.S.C. §§ 1606(h) and 1620 (collectively, the "federal benefits"). The court, however, denied the Class's motion for summary judgment on the claim that ERISA precluded deductions by the state from benefits distributed under an ERISA-qualified pension plan (the "ERISA claim").

On November 19, 1997, the Class appealed the dismissal of their Due Process and Excessive Fines claims and the denial of their summary judgment motion on the ERISA claim. However, we concluded that the district court's order was not then appealable because no final order had been

entered. We therefore remanded the action on May 3, 1999 but retained jurisdiction to dispose of the appeal once the district court entered an appealable final or interlocutory order. On January 28, 2000, the district court entered summary judgment in favor of the Department on the ERISA claim and certified finality pursuant to Federal Rule of Civil Procedure 54(b) as to all claims except the issue of disgorgement of funds. We now have jurisdiction to entertain this appeal.

## DISCUSSION

### I. The District Court's Subject Matter Jurisdiction

■■■■ The Department argues that, pursuant to the TIA, the district court did not have subject matter jurisdiction to resolve this dispute. The TIA prohibits a district court from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Whether a deduction constitutes a "tax" within the meaning of the TIA depends on: (1) the entity that imposes the deduction; (2) the parties on whom the deduction is imposed; and (3) whether the funds collected from the deduction are expended for general public purposes, or used for the regulation or benefit of the parties on whom the deduction is imposed. See Bidart Bros. v. California Apple Comm'n, 73 F.3d 925, 931 (9th Cir.1996). Federal law determines whether an assessment qualifies as a "tax" for purposes of the TIA. See American Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Management Dist., 166 F.3d 835, 837 (6th Cir. 1999).

Based on the factors articulated in Bidart Bros., we conclude that the 35% deduction provided for by the Statute is not a "tax" under the TIA. Although the Washington state legislature enacted the Statute, the 35% deduction is only imposed on a select group of people: those inmates who receive funds from outside sources. See Bidart Bros., 73 F.3d at 931 ("An assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class."). Additionally, the funds are not currently paid to the tax collector or the state's general fund. Instead, the 5% and 10%[3] portions of the 35% deduction are used to benefit a segment of the population consisting of the victims of crime and the inmates themselves, respectively. See Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 5–6 (1st Cir.1992) (holding that an accident compensation statute, which imposed the costs of motor vehicle accidents on the vehicle owners and which assured compensation for the victims of these accidents, was not a tax for purposes of the TIA).

Moreover, the remaining 20% of the 35% deduction is used to defray the cost of incarcerating the inmates, and is thus more akin to a regulatory fee than a tax. See San Juan Cellular Tel. Co. v. Public Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992) (explaining that the classic "regulatory fee" serves regulatory purposes by, among other things, "raising money placed in a special fund to help defray the agency's regulation-related expenses"); see also Edye v. Robertson, 112 U.S. 580, 590, 5 S.Ct. 247, 28 L.Ed. 798 (1884) (holding that a statute, which imposed a duty of fifty cents per passenger on ship owners who brought immigrants into the United States and was used to defray both the expense of regulating immigration and the

---

**3.** The 10% deducted for purposes of the inmates' savings account will ultimately be returned to the particular inmate from whom it was taken upon the inmates release or earlier, if an emergency arises. As the Department concedes, this portion of the deduction is

therefore not a tax under the TIA. See Bidart Bros., 73 F.3d at 932 (finding an assessment was not a tax in part because the assessment, which was collected by a commission, would be returned to apple producers if the commission terminated).

care of such immigrants, was not a "tax"). Although the general public may ultimately receive an incidental benefit from the 5% and 20% portions of the 35% deduction, the direct recipients of the funds are limited to a select group. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (stating that a mandatory $14 student fee paid into a special fund to pay for the cost of printing newspapers published by various student groups was not a "tax"). Based on our application of the *Bidart Bros.* factors, we conclude that the deductions provided for by the Statute do not constitute a "tax" within the meaning of the TIA. The district court therefore had jurisdiction to adjudicate the Statute's validity.

## II. *Dismissal of the Class's Due Process and Excessive Fines Claims*

■ We review *de novo* the district court's dismissal of the Class's due process and excessive fines claims for failure to state a claim. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998). If support exists in the record, the dismissal may be affirmed on any proper ground, even if the district court did not reach the issue or relied on alternative grounds. *See id.* "[A] complaint should not be dismissed unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

### A. *The Due Process Claim*

In their Complaint, the Class alleges:

20. Members of the Class have a property interest in money sent to them while incarcerated. The penalty imposed upon any given member of the Class bears no relationship to the actual costs of his or her incarceration or the seriousness of his or her crime. Pursuant to the Seizure Statute, 35% of these funds are seized unfairly without any hearing, and in violation of both the substantive and procedural due process rights to which members of the Class are entitled under the Fourteenth Amendment of the United States Constitution.

As to the substantive due process claim, the district court concluded that the Class's allegations were "completely lacking in supporting factual detail" and would not, as a matter of law, overcome a finding that a rational basis supported enactment of the Statute. As to the procedural due process claim, the district court concluded that each member of the Class received procedural due process in the Statute's legislative enactment, without the necessity of a pre-deprivation hearing.

■ The Class contends that the district court erred in dismissing the due process claims for two reasons. First, the Class urges us to remand and allow the inmates to develop a factual record to support their claim that the Department failed to pay interest on personal inmate savings accounts, failed to hold a pre-deprivation hearing regarding this interest, and applied the 10% personal inmate savings account deduction to death row inmates, all of which violates procedural and substantive due process. A review of the record, however, indicates that the Class did not plead, brief, or argue the aforementioned issues in the district court. The Complaint does not mention any issue relating to death row inmates, let alone facts to support a due process claim. Nor does the complaint allege a due process claim for the alleged deprivation of interest payments.[4]

■ Additionally, the Class failed to brief or argue these issues in response to the Department's motion to dismiss. Indeed, the parties and the district court analyzed the claim based solely on the

---

4. In their "facts" section, the Class mentions that the Department has not paid interest on the inmate savings account. However, no mention of the interest issue is made in the Class's "claims" section to provide the Department with fair notice of any such claim.

Class's *property right* to incoming funds. Finally, the record is devoid of any evidence demonstrating that the Class sought reconsideration of the district court's ruling on the ground that it had misunderstood the complete nature of their due process claim. Because the Class failed to raise the interest or death row inmate issues in the district court, we decline to entertain them on appeal. *See Bolker v. Commissioner*, 760 F.2d 1039, 1042 (9th Cir.1985) (stating the general rule that an issue raised for the first time on appeal will not be considered).[5]

▬ Second, the Class argues that the district court failed to reconsider its dismissal of the procedural due process claims after the court declared the Statute void insofar as it authorized deductions from the federal benefits received by the Class. To state a procedural due process claim, the Class must allege "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir.1993). Because inmates have a protectable property interest in funds received from outside sources, including those received from federal benefits, *see Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir.1985), the Department's deduction of funds from the federal benefits necessitates compliance with due process.

▬ The district court originally dismissed the Class's procedural due process claims because, in balancing the competing factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976),[6] it concluded that a pre-deprivation hearing before funds were deducted from outside sources was unnecessary. In a subsequent order, however, the court granted partial summary judgment in favor of the Class, declaring the Statute void to the extent that it authorized the deduction of funds from federal benefits received by the Class. The court did not, however, consider the impact of its ruling on its previous order dismissing the Class's procedural due process claim.

The Class contends that the district court should have reconsidered their due process claim for deductions taken from federal benefits. The Class insists that "the rationale that the prisoners are not entitled to a predeprivation hearing disappears after the district court determined that the State violates the inmates' due process rights each time it deprives them of property interests in these funds." We find this argument patently circular and must disagree. In this appeal, the Class challenges the due process afforded to inmates regarding deductions from federal benefits *only*. As the district court deemed the Statute void to the extent that federal benefits are deducted, the amount of process due prior to such deduction is rendered moot. Simply put, because the Department can no longer make the 35% deduction from federal benefits, a deduc-

---

**5.** No exceptions apply that would allow us to review the issues for the first time on appeal. This is not the "exceptional" case in which review is necessary to prevent a miscarriage of justice or preserve the integrity of the judicial process. *See Bolker*, 760 F.2d at 1042. Nor has the law changed during the pendency of this appeal. *See id.* Finally, the record is insufficiently developed for this court to address the issues on appeal. *See id.* For example, RCW 72.09.111(1)(d) was amended in 1999 to exempt inmates sentenced to death from the requirement of having a mandatory savings account. This claim may be moot, especially if Washington has refunded the savings account deduction to death row inmates.

Nor is the record developed for us to apply *Tellis v. Godinez*, 5 F.3d 1314 (9th Cir.1993).

**6.** The following factors are balanced when determining the timing and nature of a hearing due a plaintiff: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

tion hearing is no longer at issue. Indeed, during oral argument, counsel for the Class agreed that if the court concluded that the Statute was void with respect to certain deductions, "no predeprivation hearing would be needed." We therefore affirm the dismissal of the Class's due process claim based on deductions from federal benefits.

### B. *The Excessive Fines Claim*

The Class argues that the district court's dismissal of their Excessive Fines claim on the grounds that the deductions provided by the Statute are "neither fines nor excessive" was in error. As a threshold matter, the Department and Amici argue that the Class has not alleged sufficient facts to demonstrate the requisite standing to challenge the Statute as applied.

#### 1. *Standing*

To demonstrate standing, the Class must allege (1) an actual or imminent injury, which is concrete and particularized and not hypothetical or conjectural, (2) that the injury is fairly traceable to the challenged actions of the defendant, and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Abboud v. INS*, 140 F.3d 843, 847 (9th Cir.1998). At the pleading stage, general factual allegations resulting from the defendant's conduct may suffice to establish standing. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

In their Complaint, the Class alleges a number of facts to support standing. First, the Class states in paragraph 15 of the Complaint:

15. Defendant Riveland began seizing funds on May 20, 1996. Through June 17, 1996 Riveland has seized funds from at least 6,104 separate transactions. Over $100,000 has been seized in the first month of the Seizure Statute's operation.

Second, the Class explains that the "penalty imposed upon any given member of the Class bears no relationship to the actual costs of his or her incarceration or the seriousness of his or her crime," and the Department "is violating the civil and constitutional rights ·of the members of the Class." Third, the Class requests an order enjoining the enforcement of the Statute and disgorgement and restitution of the money seized under the Statute. Based on these allegations, we conclude that the Class has sufficiently demonstrated threatened injury (funds, which allegedly bear no relationship to the costs of incarceration or perpetrated harm, are collected from the Class), causation (the Department enforces the Statute), and redressability (the Department would be forced to disgorge proceeds and discontinue collections under the Statute if the court ruled in the Class's favor). We therefore hold that the Class has standing to challenge the Statute as violating the Excessive Fines Clause.

#### 2. *The Merits*

We now consider whether the Class has stated a cognizable claim under the Excessive Fines Clause. The Excessive Fines Clause limits the Department's " 'power to extract payments, whether in cash or in kind, "as punishment for some offense." ' " *United States v. Bajakajian*, 524 U.S. 321, 328, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)). "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, . . . ." *United States v. Halper*, 490 U.S. 435, 447–48, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *see also Louis v. Commissioner*, 170 F.3d 1232, 1236 (9th Cir.1999) ("Even a civil sanction may be punitive for Eighth Amendment purposes."), *cert. denied*, —— U.S. ——, 120 S.Ct. 932, 145 L.Ed.2d 812 (2000).

Two questions are pertinent when determining whether the Excessive Fines Clause has been violated: (1) Is the statutory provision a fine, *i.e.*, does it impose punishment? and (2) If so, is the fine excessive? *See Austin*, 509 U.S. at 619, 622, 113 S.Ct. 2801. As correctly noted by Appellant, "the first question determines whether the Eighth Amendment applies; the second determines whether the Eighth Amendment is violated."

### a. *Whether the Eighth Amendment Applies*

The Supreme Court has indicated that a determination of "punishment" for excessive fines purposes is conceptually distinct from other purposes. *See United States v. Ursery*, 518 U.S. 267, 282–83, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (highlighting the difference between punishment under the Double Jeopardy Clause and the Excessive Fines Clause); *see also Hudson v. United States*, 522 U.S. 93, 102–03, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In the seminal case of *Austin*, 509 U.S. at 602, 113 S.Ct. 2801, the Court considered an excessive fines challenge to a civil forfeiture statute. According to the Court in *Austin*, " 'a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, . . . .' " . *Id.* at 610, 113 S.Ct. 2801 (quoting *Halper*, 490 U.S. at 448, 109 S.Ct. 1892). Consequently, if the deductions authorized by the Statute serve the purpose of retribution or deterrence, they are subject to Eighth Amendment scrutiny.

The Class argues that the 5% deduction for the Crime Victim's Compensation Fund is punitive, at least in part, because it bears no rational relationship to the costs actually inflicted by the inmate, it duplicates the existing restitutionary scheme in Washington,[7] and it imposes a sanction that has historically been regarded as serving deterrent and retributive purposes. In *United States v. Dubose*, 146 F.3d 1141 (9th Cir.), *cert. denied*, 525 U.S. 975, 119 S.Ct. 430, 142 L.Ed.2d 350 (1998), we examined the constitutionality of the federal restitution statute in the context of an Eighth Amendment excessive fines challenge. The Mandatory Victim's Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A–3664, requires courts to impose restitution to identifiable victims who have suffered physical injury or pecuniary loss as a result of a defendant's crime. Based on the legislative history of the MVRA and the historical understanding of restitution, we concluded in *Dubose* that restitution under the MVRA is punishment for purposes of the Eighth Amendment. *See id.* at 1145.

Likewise, we conclude that the victims' compensation deduction under RCW 72.09.111(1)(a)(i) serves the traditional goals of deterrence and is therefore punishment. Indeed, even more comprehensive than the MVRA, the Washington Statute provides that five percent of funds received by *each and every inmate* is deposited into a general account allocated to crime victim's compensation. Thus, regardless of whether an inmate committed an offense for which restitution is appropriate and regardless of whether the inmate had already been ordered to pay court-ordered restitution at sentencing, the inmate is required under the Statute to surrender 5% of the funds he receives. Extracting payments from each and every inmate, without regard to the existence and extent of any injury to a victim is not remedial. We therefore conclude that the victim's compensation deduction is punitive and subject to Eighth Amendment scrutiny.

---

7. In Washington, a court is authorized to require an offender to pay restitution after an individualized inquiry into the crime and circumstances of the offender. *See* Wash. Rev. Code Ann. §§ 9.94A.140, .142 (West 1999).

Additionally, the state requires all offenders to pay a flat penalty to the Crime Victim's Compensation Fund upon conviction. *See* Wash. Rev.Code Ann. § 7.68.035 (West 1999).

Additionally, the Class argues that the mandatory 20% cost of incarceration deduction is punitive, in part, for the same reasons as the victim's compensation deduction. In *United States v. Zakhor*, 58 F.3d 464 (9th Cir.1995), we considered United States Sentencing Guideline ("U.S.S.G.") § 5E1.2(i), which requires the sentencing court to "impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered." The issue before us in *Zakhor* was whether a fine to recover supervision costs under § 5E1.2(i) was consistent with providing "just punishment" and "adequate deterrence" as articulated in the Sentencing Reform Act. *See Zakhor*, 58 F.3d at 465, 466. We concluded that the costs society must undertake to punish the convict for the offense satisfies the goal of "just punishment" and forcing a criminal to internalize the costs of such conduct satisfies the goal of "adequate deterrence." *See id.* at 466. Because the cost of incarceration deduction in the Statute performs the same function as U.S.S.G. § 5E1.2(i), we conclude that it advances the same goal—punishment. The Eighth Amendment therefore applies.

We are mindful that the Washington Court of Appeals in *In re Metcalf*, 92 Wash.App. 165, 963 P.2d 911, 921 (1998), *cert. denied*, 527 U.S. 1041, 119 S.Ct. 2405, 144 L.Ed.2d 803 (1999), concluded that the deductions mandated by the Statute were not punitive and therefore did not violate the Excessive Fines Clause. The court in *In re Metcalf* applied the factors in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), to determine whether the statute imposed punishment for purposes of defendant's ex post facto, double jeopardy, bills of attainder, and excessive fines claims. *See Metcalf*, 963 P.2d at 918–919. The Supreme Court in *Austin*, however, stated that an Eighth Amendment Excessive Fines analysis does not include an application of the *Kennedy* factors, which are reserved for those cases when a nominally civil penalty

should be reclassified as a criminal penalty, thereby necessitating the safeguards that attend a criminal prosecution. *Austin*, 509 U.S. at 610 n. 6, 113 S.Ct. 2801. Following the Court's guidance in *Austin*, we do not believe that an analysis of the *Kennedy* factors is appropriate for performing an Eighth Amendment inquiry as to whether the statute serves a punitive purpose.

Additionally, the *Metcalf* court distinguished the victim's compensation deduction in the Statute from restitution ordered at sentencing. *See Metcalf*, 963 P.2d at 920. Because the deductions mandated by the Statute are not made for any particular victim but are distributed into a general fund, the court concluded that the Statute did not advance retributive or deterrent purposes but was solely remedial. *See id.* We disagree with that distinction, and instead, we conclude that there is an inherently punitive purpose when a mandatory victim restitution deduction is *not* related to the injury caused by the inmate—whether or not the funds are distributed to an individual or deposited into a general fund. We therefore decline to follow the reasoning or holding in *Metcalf*.

b. *Whether the Eighth Amendment is violated*

Once a statute is deemed to be punitive and is thus a "fine" within the meaning of the Excessive Fines Clause, we must turn to the question of whether the fine is excessive. *See Austin*, 509 U.S. at 622, 113 S.Ct. 2801. The Supreme Court in *United States v. Bajakajian*, 524 U.S. at 336–37, 118 S.Ct. 2028, recently held that a fine violates the excessiveness standard of the Eighth Amendment if the assessment is grossly disproportional to the crime committed. *See also Dubose*, 146 F.3d at 1145.

■■ The Class argues that excessiveness is a factual issue appropriate for decision on a developed record. *See Grove v. Kadlic*, 968 F.Supp. 510, 516–17 (D.Nev.

1997) ("[A] mere allegation of excessiveness suffices to survive a 12(b)(6) motion."). The Department insists, however, that the Class's excessiveness argument is foreclosed by the 1997 amendment to the Statute, which limits the total amount of the deductions under the statute to the total cost of the inmate's incarceration. Effective July 27, 1997, the Statute provides:

> The amount deducted from an inmate's funds under subsection (2) of this section [RCW 72.09.111(1)(a) ] shall not exceed the department's total cost of incarceration for the inmate incurred during the inmate's minimum or actual term of confinement, whichever is longer.

Wash. Rev.Code Ann. § 72.09.480(3). Because the total amount of deductions includes the 10% mandatory savings account that will eventually be distributed to the inmate, the Department contends that an inmate will only pay a maximum of 72% of the deduction to satisfy the inmate's cost of incarceration, which as a matter of law is not excessive.[8]

In *Dubose,* we considered the proportionality of a victim's restitution order under the MVRA, stating " '[w]here the amount of restitution is geared directly to the amount of the victim's loss caused by the defendant's illegal activity, proportionality is already built into the order.' " *Dubose,* 146 F.3d at 1145 (quoting *United States v. Dean,* 949 F.Supp. 782, 786 (D.Or.1996), *aff'd,* 146 F.3d 1141 (9th Cir. 1998)); *see also United States v. Price,* 65 F.3d 903, 908 n. 7 (11th Cir.1995). In this case, the amount of the deduction appears to be directly proportional to the average cost of incarceration that the inmate will incur during his or her minimum or actual term of confinement, whichever is longer. By definition, it seems that a fine based on a criminal's cost of incarceration will always be proportional to the crime committed. *See Zakhor,* 58 F.3d at 466 ("[B]ecause lengthier sentences are more costly, a fine linked to the convict's costs of incarceration reflects the degree of harm caused by the convict's offense.").

The Class argues that a post-amendment excessiveness inquiry is necessary because the minimum term of confinement for an inmate may be longer than the actual term, resulting in additional, improper deductions. According to the Class, if an inmate spends the final six months of a year-long sentence in home detention, his minimum term of confinement will be longer than his actual term of confinement, resulting in the taking of mandatory deductions while the inmate is serving home detention. We find the Class's argument unavailing.

The Statute defines "minimum term of confinement" as the minimum period of time an inmate "will be confined in the custody of the department [of Corrections]" in light of the sentence and possible early release credits. Wash. Rev.Code Ann. § 72.09.480(1)(b). The Statute defines "cost of incarceration" as the costs of shelter, food, clothing, transportation, supervision, and other services while in custody of the Department of Corrections. *See id.* § 72.09.480(1)(a). When an inmate is confined at home, all of these costs do not exist.

RCW 9.94A.150(6) provides that up to six months of the sentence may be served in "partial confinement designed to aid the offender in finding work and reestablishing himself or herself in the community." Wash. Rev.Code Ann. § 9.94A.150(6) (West 1999). If an inmate is released under this provision prior to his

---

**8.** This figure is calculated by attributing a percentage of the entire 35% deduction to each type of deduction. For example, the restitution component comprises 14.3% of the whole deduction, the savings component comprises 28.5%, and the cost of incarceration component comprises 57.2%. Accordingly, all inmates (except those sentenced to life imprisonment or death, as they are exempt from the savings component) will contribute a maximum of 71.5% (14.3% plus 57.2%) to pay for the inmates overall cost of incarceration because 28.5% of the total deduction remains in a savings account dedicated to the inmate.

completion of the minimum term of confinement in a penal institution, the Class contends that deductions already taken might exceed the total actual cost of confinement. However, it is impossible at the beginning of the sentence to determine whether an inmate will be granted partial confinement at home. Should this occur and the deductions in fact exceed the actual cost of confinement, the inmate has an adequate post-deprivation remedy for a refund through the established prison grievance procedure or by filing a tort claim with the state. *See* Wash. Rev.Code Ann. § 4.92 *et seq.* (West 1999). Such an adequate post-deprivation remedy satisfies procedural due process when the deprivation of property is sporadic and unpredictable. *See Hudson v. Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (concluding that a post-deprivation remedy satisfies the Due Process Clause when the deprivation is random and unauthorized and is not pursuant to an established policy).

■ The Class further contends that a post-amendment inquiry is necessary because inmates are overpaying their costs of incarceration under duplicative Washington statutes. RCW 9.94A.145 allows the sentencing court to require a felony offender to pay for the cost of incarceration if the court determines that the offender has the appropriate financial means. *See* Wash. Rev.Code Ann. § 9.94A.145 (West 1999). As RCW 9.94A.145 and the Statute at issue contain no reference to the other, the Class contends that inmates could be made to pay more than their actual cost of incarceration. We are not persuaded by the Class's argument.

Washington has constructed a hierarchy of deductions to be withdrawn from an inmate's account. *See* Wash Rev.Code Ann. § 72.11 *et seq.* (West 1999). This hierarchy ensures that each court-ordered or statutory payment is appropriately withdrawn and allocated. By statute, the Secretary of the Department of Corrections is the custodian of all inmate funds,

whether those funds are possessed when the inmate is incarcerated, sent to the inmate from outside sources, or earned while the inmate is incarcerated. *See id.* § 72.11.020. The Secretary is directed to pay "all court-ordered legal financial obligations" first, which includes the cost of incarceration deduction in RCW 9.94A.145. *See id.* § 72.11.030. Only after legal financial obligations are satisfied can the Secretary deduct statutorily-imposed withdrawals from the inmate's account. *See id.* We note, again, that if the inmate believes his account is being overcharged, an internal prison grievance procedure or a tort claim against the state are available remedies. *See id.* § 4.92 *et seq.* We therefore conclude that the victim's compensation and cost of incarceration deductions, after passage of the 1997 amendment, are not, as a matter of law, excessive.

■ We cannot ignore, however, the enforcement of the Statute from May 20, 1996 until July 27, 1997, when the amendment prohibiting deductions that exceed the cost of the inmate's incarceration became effective. Because we conclude that the victim's compensation deduction and the cost of incarceration deduction are subject to Eighth Amendment scrutiny and that the Class has stated a claim in their Complaint, we must remand to the district court to determine whether any of the Class member's deductions were excessive pre-amendment, in light of the unlimited language of the Statute as originally enacted. It is appropriate for the district court to conduct the fact-intensive inquiry necessary to determine the issue of excessiveness. *See United States v. One 1978 Piper Cherokee Aircraft*, 91 F.3d 1204, 1210 (9th Cir.1996) ("[T]he issue of excessiveness may depend upon various factors and conduct with which the district court is more familiar than this court. . . ."). We therefore reverse the district court's dismissal of the excessive fines claims for the period of time between May 20, 1996 and July 27,

1997 and remand for a factual determination of excessiveness.[9]

## III. *The ERISA Claim*

The Class contends that the district court's grant of summary judgment in favor of the Department on the ERISA claim was improper. We review a grant of summary judgment *de novo* and must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the law. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). As the facts are not in dispute, we confine our discussion to whether, as a matter of law, § 206(d)(1) of ERISA, 29 U.S.C. § 1056(d)(1), bars deductions from benefits distributed under ERISA-qualified pension plans.

The district court concluded that the Department's deductions from benefits distributed from ERISA-qualified pension plans did not violate the "anti-alienation" provision contained in § 206(d)(1) of ERISA. Section 206(d)(1) provides: "Each pension shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). The text of § 206(d)(1) is unclear whether it prohibits the alienation and assignment of the right to receive only undistributed pensions funds or in addition prohibits the alienation and assignment of funds that have actually been distributed to the plan beneficiary. The legislative history surrounding § 206(d)(1) does not

provide any guidance. The Department of the Treasury, however, has issued regulations under § 206(d)(1), which define the terms "assignment or alienation" as:

> Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)–13(c)(1)(ii). Relying on § 1.401(a)–13(c)(1)(ii), both the Third and Tenth Circuits have held that § 206(d)(1) does not prohibit assignment or alienation of pension benefits that have actually been distributed under the plan. *See Guidry v. Sheet Metal Workers Int'l Assoc.*, 10 F.3d 700 (10th Cir.1993), *aff'd in part on reh'g en banc*, 39 F.3d 1078 (1994); *Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville*, 16 F.3d 52 (3d Cir.1994).

The issue presented to the Tenth Circuit in *Guidry* concerned whether § 206(d)(1) prohibited a union from satisfying a judgment against a former union pension fund trustee, who pled guilty to embezzlement, by garnishing pension benefits paid to his bank account. The Supreme Court had ruled in an earlier proceeding between the parties that § 206(d)(1) prohibited the union from imposing a constructive trust on the beneficiary's pension benefits. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375–76, 110 S.Ct.

---

9. In the Complaint, the Class contends that the deductions violate procedural due process. The Amici argue that there is no procedure to determine the amount of the cost of confinement to measure against the deductions. Thus, the Department of Corrections may set an arbitrary amount as the actual cost of confinement. The Amici contends that the Class should have notice and an opportunity to be heard to contest the dollar figure chosen by the Department as the actual cost of confinement. The district court summarily rejected the procedural due process claim. The Class, however, did not raise this specific issue in their opening brief on appeal and it is thus not before us at this time. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999). Furthermore, the Complaint did not clearly present this procedural due process claim for the district court's consideration. *See* Complaint at ¶ 20. Given that the case is being remanded to the district court on the excessive fines issue, the Class may seek to amend their Complaint to clearly state such a claim and have the district court consider the claim that failure to be given notice and a predeprivation opportunity to be heard on the amount of the actual cost of the inmate's incarceration violates their right to procedural due process.

680, 107 L.Ed.2d 782 (1990). Following the Supreme Court's order of remand, however, the pension benefits at issue were paid from the ERISA pension plan to the beneficiary's bank account, which the union then garnished. The district court was thus faced with the issue of whether § 206(d)(1), although prohibiting a constructive trust from being imposed on the pension benefits, would allow garnishment of pension benefits after they had been distributed to the beneficiary. The district court held that because the Supreme Court had previously decided the issue, the law of the case required it to bar the garnishment proceedings as being in violation of § 206(d)(1).

On appeal, the Tenth Circuit reversed the district court. It concluded that because no benefits had actually been paid to the beneficiary when the case was before the Supreme Court, the Supreme Court had not explicitly or implicitly decided the issue of whether § 206(d)(1) barred the garnishment of pension benefits distributed to the beneficiary. *See Guidry*, 10 F.3d at 706–08. As the intent of Congress was unclear in enacting § 206(d)(1), the court considered the Treasury Department regulation's definition of "assignment" and "alienation" in 26 C.F.R. § 1.401(a)–13(c)(1)(ii), which it concluded was applicable to § 206(d)(1). *See id.* at 708–09.

Because the regulation's definition of "alienation" and "assignment" only prohibited the acquisition from a participant or beneficiary of "a right or interest enforceable against the plan," the court held that § 206(d)(1) did not protect pension benefits that had been distributed from the plan from being alienated or assigned. *See id.* at 709–10. The Tenth Circuit held that the regulation was consistent with the text of ERISA, and it constituted a permissible interpretation of § 206(d)(1) in light of Congress's failure to specify the meaning of the anti-alienation provision. *See id.* at 710–12.

The court in *Guidry* also determined that the regulation's interpretation of § 206(d)(1) was consistent with Congress's approach to the same issue in other income protection statutes. Specifically, it compared the language of § 206(d)(1) to more specific prohibition language found in the Social Security Act, 42 U.S.C. § 407(a), which prohibits the "right to any future payment" from being assigned and prohibits garnishment and attachment of "the moneys paid or payable" to the beneficiary. The court also examined the Veterans Benefits Act, 38 U.S.C. § 5301(a), which makes payments of benefits "made to, or on account of, a beneficiary … exempt from the claim of creditors," and provides that these benefits are not "liable to attachment … either before or after receipt by the beneficiary." *See Guidry*, 10 F.3d at 712. The court concluded that because Congress had added language in these other income protection statutes that explicitly exempted benefits paid to the beneficiary from garnishment and had not included such language in § 206(d)(1), it could infer that Congress had made a deliberate decision not to extend protection of the anti-alienation provision to benefits that had actually been distributed from the pension plan. *See id.* at 712. It therefore concluded that 26 C.F.R. § 1.401(a)–13(c)(1)(ii)'s interpretation of § 206(d)(1) was not "arbitrary, capricious or manifestly contrary to the statute." *See id.* at 712–13; *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

Similarly, in *Trucking Employees*, the Court of Appeals for the Third Circuit, following the Tenth Circuit's reasoning in *Guidry*, held that § 206(d)(1) did not prohibit pension funds that had been distributed to the beneficiary from being alienated. *See Trucking Employees*, 16 F.3d at 56; *see also Retirement Fund Trust v. Franchise Tax Bd.*, 909 F.2d 1266, 1284–

85 (9th Cir.1990) (concluding that, in the absence of any expression of legislative intent to the contrary, the Treasury regulation's definition of "assignment or alienation," which excludes an arrangement for the withholding of taxes from plan benefits, is a permissible construction of § 206(d)(1)).

The Class urges us to adopt the Fourth Circuit's reasoning in *United States v. Smith*, 47 F.3d 681 (4th Cir.1995). In *Smith*, the Fourth Circuit, contrary to the Tenth and Third Circuits, held that § 206(d)(1) prohibits pension funds from being alienated even after the funds are distributed. *See id.* at 684. In so holding, the Fourth Circuit distinguished between a beneficiary taking a pre-retirement draw from an ERISA plan and a beneficiary receiving pension funds as an annuity after retirement. *See id.* at 683. The court concluded that only the latter funds were protected by § 206(d)(1) from alienation. *See id.* The court found support for its distinction in the Supreme Court's decision in *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979), in which the Supreme Court held that the Railroad Retirement Act precluded the district court from ordering that a beneficiary pay a portion of his railroad retirement benefits to his spouse. The Fourth Circuit concluded that because the anti-alienation provision in the Railroad Retirement Act was substantially similar to § 206(d)(1), it followed that § 206(d)(1) also precluded benefits that had been distributed from an ERISA-qualified pension plan from being alienated. *See Smith*, 47 F.3d at 683–84.

We are not persuaded by the Fourth Circuit's analysis. First, Treasury Regulation § 1.401(a)–13(c)(1)(ii) makes no distinction between lump sum payments made before retirement and distributions made after retirement, a distinction made by the *Smith* court. Instead, as the Tenth Circuit in *Guidry* concluded, it only draws a distinction between distributed and undistributed funds and prohibits the alienation of the former, but not the latter. We also do not agree that the Railroad Retirement Act provision at issue in *Hisquierdo* is "substantially similar" to § 206(d)(1). Section 231m(a) of the Railroad Retirement Act prohibits benefits from being subject to attachment or garnishment "under any circumstances whatsoever." Neither § 206(d)(1) nor the applicable regulation contains such a sweeping prohibition.[10]

Accordingly, we follow the lead of the Third and Tenth Circuits. We conclude that 26 C.F.R. § 1.401(a) –13(c)(1)(ii)'s interpretation of § 206(d)(1) is not arbitrary, capricious, or manifestly contrary to the statute and hold, based on the regulation's interpretation of § 206(d)(1), that this section does not preclude the Department from deducting funds pursuant to the Statute from benefits received from ERISA-qualified pension plans. We therefore affirm the district court's grant of partial summary judgment in favor of the Department on this claim.

Having concluded that the district court's holdings were correct, except as to the excessive fines claim, we affirm the order of the district court in part and reverse in part and remand for further proceedings consistent with the opinion.[11]

AFFIRMED IN PART REVERSED IN PART AND REMANDED.

**10.** The Class also argues that the Supreme Court's decision in *Boggs v. Boggs*, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) is controlling. We disagree. In *Boggs*, the Supreme Court concluded that a wife's attempted transfer by will of her interest in her ex-husband's undistributed pension benefits was prohibited by ERISA. The Supreme Court, however, limited its ruling to the pre-distribution context, emphasizing "this case does not present the question whether ERISA would permit a nonparticipant spouse to obtain a devisable community property interest in benefits paid out during the existence of the community between the participant and that spouse." *Id.* at 845, 117 S.Ct. 1754.

**11.** Each party shall bear their own costs.