20I5 OCT 26 AM 9: I9



## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71448-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JULIANA MIN CRATSENBERG, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 26, 2015 |
| | ) | |

LEACH, J. — Juliana Cratsenberg appeals her conviction for theft in the first degree based on her withdrawal of funds from a bank account held jointly in her name and her former husband's name.[1]  She challenges the trial court jury instructions about ownership of joint account funds.  Also, she claims her counsel provided ineffective assistance by failing to request certain instructions and failing to request a mistrial when a witness violated an order limiting trial testimony.  Because the record supports no inference that the disputed account contained community property, the court properly instructed the jury, and counsel did not provide deficient representation by failing to request a community property instruction.  And because trial counsel strategically elicited the excluded

---

[1] Juliana and Andrew Cratsenberg divorced in 2011.  He died in 2013.

testimony for tactical reasons, counsel did not provide Juliana ineffective assistance when he did not request a mistrial. We affirm.

FACTS

Andrew Cratsenberg Sr. began to see Juliana, also known as Young Min Song, in 2008. Andrew's wife of many years died in January 2008. Andrew and his deceased wife created and grew Cratsenberg Companies and its subsidiary, Cratsenberg Properties, which owned commercial real estate in Federal Way. Their sons, Andrew Jr. (Butch) and Larry, worked for the company at various times during their lives.

In March 2008, Andrew's sons expressed concern to his physician, Dr. Brian McDonald, about Andrew's declining cognitive abilities. In April, Dr. McDonald administered a mini mental status exam to Andrew. An exam score under 24 suggests patient dementia. Andrew scored a 21.

The next month, Andrew introduced his sons to Juliana. In June, Andrew asked Butch to help Juliana move into Andrew's house. Larry disapproved of his father's relationship with Juliana. Later that year, Larry confronted Juliana when he found her wearing his mother's ring. Andrew fired Larry from Cratsenberg Companies over the incident. By the fall of 2008, Butch had also left the family business.

With both sons gone, Andrew and Juliana managed the business. But they failed to properly maintain the company's main property, Center Plaza. And while Andrew had authorized Juliana's use of his KeyBank checking account, Larry prevented Andrew from adding Juliana to the business accounts.

In January 2009, Butch and Larry filed a guardianship action against their father. Julie Schisel, the guardian ad litem, asked psychologist Renee Eisenhauer to evaluate Andrew. Eisenhauer concluded that Andrew was "cognitively compromised" due to his progressive dementia. She stated that Andrew needed assistance managing his business and financial affairs but could live independently with support and might need more assistance as his dementia progressed. Schisel suggested an alternative to guardianship. She recommended that Andrew place his assets in a revocable living trust administered by a trustee and transfer a majority interest in Cratsenberg Companies to Butch and Larry.

Andrew and Juliana married on March 26, 2009. When Butch and Larry learned of the marriage, they filed a petition under the vulnerable adult protection act, chapter 74.34 RCW. They obtained a temporary order that froze Andrew's assets and prevented Juliana from accessing them. The order placed Larry in control of Cratsenberg Companies' operations.

To resolve the guardianship and vulnerable adult cases, Andrew, Juliana, Butch, Larry, their respective counsel, and Schisel signed a CR 2A agreement on August 24, 2009. The agreement required that Andrew transfer certain assets to family businesses and place all his remaining assets, including "[a]ll personal bank accounts," into a living trust. The agreement declared all of Andrew's assets his separate property and required that Andrew and Juliana sign a postnuptial agreement.

Andrew and Juliana executed the postnuptial agreement on the same day. It declared that each party's separate property shall remain that spouse's separate property and that all future income would be the separate property of the spouse generating it. In September, Andrew executed the living trust. The trust named Commencement Bay Guardian Services director Robin Balsam and Andrew cotrustees and designated Andrew the trust's primary beneficiary. The trust agreement gave Commencement Bay sole control over Andrew's finances but required it to consider Andrew's suggestions.

After execution of the documents, the Cratsenbergs refused to give Balsam the financial information she requested, claiming it was not her business. The couple also requested a monthly disbursement of $17,267.46, lowering the request to $13,100.00 per month when Balsam refused. Eventually, Balsam

approved a monthly budget of $4,592.00, paying many of the Cratsenbergs' bills directly.

The Cratsenbergs continued to use credit cards. When Balsam noticed large charges for cash advances and household expenses, she asked the Cratsenbergs for an explanation. Also, she asked them to stop using the card for cash, which defeated the purpose of the budget. When Balsam saw Andrew in June 2010, she thought that he had declined because he appeared agitated and was shuffling and confused. When she saw a charge for Juliana's daughter's tuition, Balsam filed a petition with the trial court asking for instructions.

By court order, Balsam acquired the requested bank account statements. These showed that the Cratsenbergs had been using a previously undisclosed account at Heritage Bank. This account was opened in the names of Juliana and Andrew in mid-July 2009. Each time the living trust made a direct deposit of Andrew's monthly allowance into his KeyBank account, those funds were immediately withdrawn in full or nearly in full, in cash, and deposited in the Heritage account. Andrew's social security check was deposited directly into the Heritage account.

The statements showed many withdrawals plus cash advances at local casinos. For the period of September 10, 2009, to October 27, 2010, the statements showed withdrawals of $25,304.75 at casinos and withdrawals of

$14,000.00 from noncasino ATMs. During the charging period, all but one of the ATM withdrawals was made with Juliana's card.

Shortly after this, Andrew suffered a stroke. Dr. McDonald and Dr. Eisenhauer each found that Andrew displayed fairly severe symptoms of dementia afterward. Butch and Larry visited Andrew to discuss the spending shown in the bank account records. Butch reported that Andrew said, "I didn't know that she was taking this money." Larry testified similarly. In November 2010, Butch and Larry filed a new guardianship petition and a petition for a vulnerable adult protection order based on this information. They obtained a restraining order, preventing Juliana from contacting Andrew, despite a declaration filed on behalf of Andrew that he loved his wife, wanted to live with her, and that they had discussed Juliana's expenditures and he did not want her punished. Andrew and Juliana divorced in 2011.

The State charged Juliana with one count of theft in the first degree with the aggravating circumstance that she knew or should have known that her husband was particularly vulnerable or could not resist. The State alleged that Juliana stole over $5,000 from her husband between September 10, 2009, and October 27, 2010, by exerting unauthorized control over Andrew's money.

Butch testified that his father did not go to local casinos to gamble, and he had never seen Andrew use an ATM machine.

-6-

Rebecca Tyrell, a financial analyst for the State, testified about the bank account and credit card transactions. She testified that Andrew added Juliana to the KeyBank joint checking account in November 2008. In 2009, from October to December, cash, checks, and cash withdrawals increased. ATM withdrawals from that account began on November 25, 2009, at a casino, and became more frequent. After December 2009, Juliana began to sign all checks. She was also responsible for all counter withdrawals and ATM withdrawals. All the deposits into the account came from Andrew's resources, but the account contract authorized both Andrew and Juliana to withdraw funds. Money withdrawn from the KeyBank account was deposited into the Heritage Bank account. This pattern began in the fall and winter of 2009. Juliana made most of the withdrawals from this account. The MasterCard account with KeyBank belonged to Andrew and his deceased wife, but in January 2010 only Andrew's name was on the account and spending increased, including cash withdrawal transactions.

In 2010, Andrew's credit card was charged a total of $63,239.93, and an additional $19,888.75 was withdrawn in cash advances. From September 10, 2009, to October 27, 2010, a total of $25,304.75 was withdrawn from casinos and nearly $14,000.00 more from noncasino ATMs. In closing, the State relied upon the credit card advances and ATM withdrawals as the acts of theft. The jury found Juliana guilty as charged.

Juliana appeals.

## STANDARD OF REVIEW

This court reviews jury instructions de novo.[2] This court reviews a claim of ineffective assistance of counsel to see if counsel provided deficient representation and if that deficient performance prejudiced the defendant.[3]

## ANALYSIS

Juliana first asserts that the court improperly instructed the jury on the law for ownership of funds in joint bank accounts under former RCW 30.22.090(2) (1981)[4] because it did not also include necessary instructions on community property law. Jury instructions are sufficient where they allow parties to argue their theories of the case, do not mislead the jury, and when read as a whole inform the jury of the applicable law.[5]

Former RCW 30.22.090(2) provides that subject to community property rights, individuals with a joint bank account own the funds in that account in proportion to what each person deposited, unless the contract of deposit states otherwise or at the time the account was created clear and convincing evidence

---

[2] State v. Johnson, 180 Wn.2d 295, 300, 325 P.3d 135 (2014).
[3] State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).
[4] Effective January 5, 2015, the legislature recodified former RCW 30.22.090 as RCW 30A.22.090 (LAWS OF 2015, ch. 37, § 4).
[5] State v. Sibert, 168 Wn.2d 306, 315, 230 P.3d 142 (2010).

of a contrary intent exists. Over Juliana's objection, the trial court gave instruction 14 to the jury. It tracked the language in former RCW 30.22.090(2):

> Funds on deposit in a joint bank account belong to each depositor in proportion to their ownership of the funds, unless the contract for deposit provides otherwise or there is evidence of a contrary intent at the time the account was created. A joint bank account holder may have the right to withdraw funds, but this does not mean that the joint bank account holder owns the funds.

The State contends that State v. Mora[6] supports the instruction. In Mora, a widow opened three bank accounts. After her son and his wife were added to the accounts, they depleted the accounts. The State charged them with 20 counts of theft.[7] In affirming their convictions on all counts, the Mora court rejected their claim that adding their names to the accounts provided them with lawful authority to exert control over account funds.[8] The court held that former RCW 30.22.090(2) governed ownership of account funds, absent evidence of intent to make a gift or authority to spend funds without the owner's permission.[9]

Juliana contends that Mora does not control when the State accuses one spouse of stealing joint account funds from the other spouse. She correctly notes that former RCW 30.22.090 makes the statutory account ownership rules subject to community property rights and that a spouse generally does not

---

[6] 110 Wn. App. 850, 43 P.3d 38 (2002).
[7] Mora, 110 Wn. App. at 853-55.
[8] Mora, 110 Wn. App. at 856-57.
[9] Mora, 110 Wn. App. at 856-57.

commit theft by withdrawing community funds from an account held jointly with the other spouse.[10] As a result, she claims that the trial court must include community property principles in its instructions to the jury about joint account fund ownership.

Juliana identifies three community property principles that she claims may apply. First, a spouse may give the other interest in community or separate property.[11] Second, when married parties commingle separate and community funds so that the funds may not be traced or identified, the commingled funds become community property.[12] And third, where parties do not mutually observe a separate property agreement, the property becomes community property.[13] She contends that because the trial court gave no community property instructions, the State could argue that all assets belonged to Andrew as separate property but Juliana could not effectively argue that she had legal authority to access and spend community funds in the accounts.

The State responds that by signing the CR 2A and postnuptial agreements, Juliana agreed that she did not have and would not acquire any community property interest in the accounts. It asserts those agreements

---

[10] State v. Coria, 146 Wn.2d 631, 638, 48 P.3d 980 (2002).
[11] Dean v. Lehman, 143 Wn.2d 12, 22, 18 P.3d 523 (2001); In re Estate of Borghi, 167 Wn.2d 480, 484, 219 P.3d 932 (2009).
[12] Mumm v. Mumm, 63 Wn.2d 349, 352, 387 P.2d 547 (1963).
[13] Mumm, 63 Wn.2d at 352.

eliminated any possibility that the accounts contained any community property funds. And it argues that the record includes no evidence showing that Andrew intended to disregard the agreements. It also contends that the absence of instructions about community property did not prevent Juliana from arguing that Andrew consented to her withdrawals from the joint account. We agree with the State.

The record contains no evidence implicating community property principles. No evidence supports any inference that Andrew had the intent to gift his separate property to the community. He signed a postnuptial agreement that eliminated any possibility of community property in the accounts. He showed signs of severe dementia at the same time Juliana withdrew and spent funds from the account. Although he wrote a letter showing his support for Juliana, this letter makes no indication of any intent to change the status of the funds or approval of Juliana's exercise of control over account funds. Indeed, Butch and Larry testified that Andrew told them that he did not know Juliana was taking money from the accounts.

Undisputed evidence traced all the funds in each account to Andrew, eliminating any commingling claim. The record contains no evidence that Andrew failed to observe the agreements' property status provisions. Juliana

has not identified any evidence implicating any community property principle in this case.

The court's instruction defining "property of another" allowed Juliana to defend on the basis that she acted with Andrew's permission.[14] The trial court also instructed the jury about the "good faith" defense.[15] The trial court's instruction about ownership of funds in joint accounts without any community property law principles correctly advised the jury about the applicable law and its instructions, as a whole, allowed each party to argue its theory of the case.

Juliana next asserts that her trial counsel provided deficient assistance when he failed to offer the court instructions on community property principles. Because the record does not support giving these instructions, Juliana was not

---

[14] Instruction 11 stated, "To constitute 'the property of another,' an item must be one in which another person has an interest, and the defendant may not lawfully exert control over the item absent the permission of that other person."

[15] Instruction 15 stated,

It is a defense to a charge of theft that the property or service was appropriated openly and avowedly under a good faith claim of title, even if the claim is untenable. The phrase "claim of title" means a right of ownership or entitlement to possession.

The State has the burden of proving beyond a reasonable doubt that the defendant did not appropriate the property openly and avowedly under a good faith claim of title. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

-12-

entitled to them. Her counsel did not provide deficient representation by failing to offer community property instructions.

Juliana further asserts that her trial counsel was ineffective because he failed to move for a mistrial after a witness testified to previously excluded evidence.

At the beginning of trial, the court excluded evidence about an earlier civil case brought by Butch and Larry where a different trial judge found Juliana violated the CR 2A agreement and the vulnerable adult protection order. The trial court also excluded use of the term "vulnerable adult" in reference to Andrew. During defense counsel's cross-examination of Butch, counsel asked Butch why Juliana did not receive money as provided in the postnuptial agreement. Butch responded that it had to do with the civil lawsuit filed by Commencement Bay. Defense counsel then asked, "What lawsuit was filed by Commencement Bay Guardianship [sic] Services?" Butch testified that Commencement Bay "filed a VAPO action, a Vulnerable Adult petition [order], against Juliana, alleging that she financially exploited my dad and she physically abused him. They were successful." Defense counsel later clarified through Butch's attorney's testimony that the attorney had filed the VAPO action on behalf of Butch and Larry and that Commencement Bay was never a petitioner in a VAPO action or guardianship proceeding.

-13-

To establish ineffective assistance of counsel, a "defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel."[16] Juliana claims that no legitimate tactic could have supported trial counsel's discussion of this information and that Butch's testimony prejudiced her.

Trial counsel explained his approach to mitigating any prejudice caused by Butch's improper testimony about the VAPO action. When the trial court questioned defense counsel about why he asked the court to exclude certain testimony only to bring it up at trial, counsel responded,

> [I]t [came] as a surprise to me that [Commencement Bay Guardian Services] were the plaintiffs in the Vulnerable Adult Protection Order [action] . . . . I think it is important what happens with this money. It clearly shows there is potential for bias issues there and what happened with it.

When the trial court stated that the evidence is mostly not favorable to Juliana, defense counsel responded, "I think it cuts both ways. If the nature of the proceedings were known, it might not hurt as much."

Juliana's trial counsel later asked to question a witness to show the jury that Juliana was not represented by counsel during the VAPO proceedings. Counsel explained to the trial court, "[The State is] painting a picture of civil proceedings, Vulnerable Adult Protection Order, that is incomplete because there

---

[16] McFarland, 127 Wn.2d at 336.

-14-

is all this talk about Juliana being represented by counsel, and she wasn't, necessarily." Thus, Juliana's trial counsel chose to address evidence of the previous VAPO action, improperly before the jury due to Butch's testimony, not by asking for a mistrial but by giving the jury a more complete picture of Juliana's vulnerable position in that action. He also used this evidence in closing argument to attack the "guardianship industry" and Andrew's two sons by describing them as the ones who exercised unauthorized control over Andrew's assets.

Thus, counsel made a tactical decision not to request a mistrial. Juliana has not shown this decision was objectively unreasonable. Because this court gives trial counsel wide latitude to control tactical decisions,[17] counsel's performance was not deficient.

## CONCLUSION

Because the record includes no evidence that the funds in the joint accounts could be community property, the trial court did not err when it did not include community property principles in an instruction about ownership of funds in a joint account. Because Juliana was not entitled to instructions about community property principles and because trial counsel engaged in an objectively reasonable trial tactic when he asked about previously excluded

---

[17] In re Pers. Restraint of Stenson, 142 Wn.2d 710, 733, 16 P.3d 1 (2001).

evidence and did not move for a mistrial, Juliana's ineffective assistance of counsel claim fails.  We affirm.

Leach, J.

WE CONCUR:

Trickey, J

Schindler, J