**FILED**
**JULY 1, 2021**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of | ) | No. 36619-7-III |
| | ) | |
| DANIEL Y. WATANABE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| SOLVEIG H. WATANABE, | ) | |
| | ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, J. — Daniel Watanabe appeals the trial court's property

award in this dissolution appeal. He argues the trial court misclassified two properties as

his former wife's separate property and erred by admitting parol evidence of intent. We

disagree and affirm.

FACTS

Daniel Watanabe and Solveig Watanabe married in January 1999 in Silvana,

Washington. After Daniel and Solveig[1] graduated from the University of Washington,

they moved to California where Daniel got a teaching job.

---

[1] We choose to refer to the parties by their first names for stylistic reasons.

*Solveig's inheritance*

In 2000, Solveig's mother unexpectedly died. Solveig and her sister, Olivia Gunn, each received a 50 percent interest in their mother's property in Arlington, Washington. Solveig also received an individual retirement account (IRA) and annuity totaling over $40,000.00 shortly after her mother's death. She received another $45,000.00 in April 2002 and $59,032.00 in December 2002. She received $100,000.00 from the sale of her mother's other property in August 2005. In February 2008, she received another distribution from her mother's estate in the sum of $732,678.87.

*Arlington property & Olivia Farm, Inc.*

After Solveig's mother's death, Daniel and Solveig took over her farm in Arlington. They started a horse boarding business, which allowed for Solveig to stay home and work the farm. They began acquiring Norwegian Fjord horses in 2001 and later decided to become breeders. In 2003, Daniel and Solveig incorporated their horse breeding and boarding business as Olivia Farm, Inc. They were 50/50 owners of the corporation. The business was not profitable.

On May 25, 2005, Solveig quitclaimed her interest in the Arlington property to herself and Daniel. The quitclaim's stated purpose was to establish community property.

*Ford property*

On May 26, 2005, the parties purchased five parcels of land (Ford property) in Stevens County. Their goal was to expand the breeding business to produce hay, train horses, and become a riding and driving destination facility. Earnest money of $1,000.00 was paid from an account that neither party recalls. The remainder of the purchase price was secured by two deeds of trust on the Arlington property in the aggregate sum of $413,000.00 in favor of Flagstar Bank. The parties made monthly mortgage payments of $2,877.00 from June 2005 to July 2006.[2] The mortgage payments came from the parties' joint checking account. After Solveig received her one-half of the proceeds from the Arlington sale, she applied those funds to the principal of the Ford mortgage.[3] Two wire transfers, totaling $407,718.69 were applied to the balance of the Ford mortgage.

In 2008, the parties purchased land adjacent to the Ford property for $33,000. That property was paid for with a check from Solveig's separate bank account. The

---

[2] The trial court indicated the payments ended prior to January 2006. *See* Clerk's Papers (CP) at 167. The payments actually ended in mid-2006. *See* Report of Proceedings (RP) at 193-94 (Daniel testifies mortgage payments ended July 2006); Ex. P-3 (Form 1098, Annual Tax and Interest Statement 2006 indicating $11,588.77 interest paid and Ford mortgage paid in full).

[3] The trial court also indicated that Solveig received the Arlington proceeds on December 31, 2015. *See* CP at 167. She received those proceeds well before then because she paid the Ford Mortgage in mid-2006. *See* RP at 193-94, 541-42; Ex. P-3.

parties constructed a home on the Ford property in 2009. Daniel worked full time for

Olivia Farm until the fall of 2012, when he started working as a teacher. Daniel's

teaching paychecks were deposited into the parties' joint bank account. Solveig deposited

$370,000 into the parties' joint account between 2010 and 2014. Solveig also paid over

$170,000 to the Olivia Farm business account during that period. These funds paid for

the construction of the family home, credit card balances, and business expenses.

*Clayton property*

In 2015, the parties purchased three tracts of land referred to as the Clayton

property. The warranty deeds for all three purchases show the purchasers as both Daniel

and Solveig. The funds to purchase two of the tracts were from Solveig's separate bank

account. The funds to purchase the third tract came from the parties' Bank of America

joint account, which Solveig had made significant deposits into beforehand.

In July 2016, the parties separated.

*Trial court proceedings*

The court held hearings in late October and mid-November 2018. The trial

spanned eight days with 15 witnesses and 220 exhibits.

*Solveig's testimony*

Solveig testified that she and Daniel had to borrow funds to purchase the Ford property because they had not accumulated any savings. Solveig used the Arlington property to secure the loan for the Ford property. At the time of the Ford purchase, they had a buyer for the Arlington property. The sale did not go through for 18 months because the buyer was a property developer who had to determine permitting for subdivisions, which impacted the final sale price.

Solveig testified she did not recall signing the quitclaim deed to Arlington. She did not intend to convert her inherited interest in her mother's home to community property. She said no one explained the consequences and although creation of community property appears on the deed, she did not understand what that meant at the time.

*Stacey Pedersen's testimony*

Stacey Pedersen, Solveig's cousin's wife, was the loan officer for the Arlington property. She testified that the lender required the Ford loan to be in Daniel's name because he was the only one who had W-2 income. She stated the lender required the Arlington quitclaim and read the loan documents that provided, "borrower must be on

5

title on the above captioned property [Arlington] prior to closing or this commitment is

null and void." Report of Proceedings (RP) at 1166.

> *Trial court's rulings*

The trial court authored a detailed memorandum opinion and thereafter entered its

findings of fact and conclusions of law.

With respect to the Arlington property, the court wrote in its memorandum

opinion:

> The testimony and exhibits do not show Solveig intended to convert her separate property in the Arlington home to community property. . . . Testimony from Stacey Pedersen and Exhibit R-158 specifically show that Flagstar Bank required Dan be added on title to the Arlington home as a condition of the loan. Dan even testified that he had good credit and Solveig had none. Solveig signed the deed at closing of the Arlington property to be able to finance the purchase of the Ford property and does not establish an intention to convert her half interest in Arlington to community property. . . .

Clerk's Papers (CP) at 143.

With respect to the Ford property, the court's findings state:

> The parties simply did not have sufficient community income or cash flow to pay anything towards the Ford purchase. Every single corporate tax return . . . shows both the net taxable income and the cash flow from Olivia Farm Inc.'s . . . operations were conducted at a loss so that payments could not have been from [Daniel's] earnings on the ranch nor did they likely have sufficient savings from prior accumulated earnings to do so.
> . . . Additionally, there was no evidence of any significant infusion of community funds to purchase the Ford property unless [Solveig's] separate

6

property interest in the Arlington home or inherited cash was converted/transmuted to community property.

. . . .

It is not disputed that the initial Ford property was titled in both their names. However, as referenced above, the entire proceeds were from [Solveig's] separate property gifts and inheritances. . . . [Daniel] asserts that the purchase was intended to be as community property and produced a copy of the Real Estate Excise Tax Affidavit . . . . However, the affidavit only references the parties as grantees on title as husband and wife. There is nothing shown on this affidavit that [Solveig] intended to transmute her separate inheritances or investments into community real estate.

Although the Statutory Warranty Deed lists both names as husband and wife, the preparation of the deed by the closing agent that lists both parties as grantees . . . does not establish community property. Rather, what was [Solveig's] intent? Was it her intent to keep her separate property separate or to convert her separate property inheritance into community property real estate?

CP at 168-70.

The court answered this question by discussing *In re Estate of Borghi*, 167 Wn.2d 480, 219 P.3d 932 (2009), in its conclusions of law:

[I]t is this court's understanding from reading <u>Borghi</u> that legal title is irrelevant irrespective of whether acquisition was before or after marriage and that it must analyze the conveyance in terms of an intention to gift, without any legal presumption of transmutation.

. . . Without such a presumption of gift to the community, [Solveig's] separate property would continue to be traced to the Ford property. Furthermore, characterization of whether such property is designated as community or separate property is only one factor to consider. Another just as important factor is the court's requirement to use its broad discretion to divide such property equitably and in doing so may consider the source of funds for the parties' acquisitions.

. . . .

7

> The value of the Ford residence was and will be considered paid either directly or indirectly from [Solveig's] separate funds.

CP at 193-94. Ultimately, the court found the Ford property's value was $1,089,079 of which $879,079 was Solveig's separate property and $210,000 was community property. The $210,000 reflected the rent free use of the property and the years of work Daniel spent improving the property.

With respect to the Clayton property, the court found that two of the three parcels were Solveig's separate property because she had paid for them from her separate account. The court found that the third parcel was community property because it had been paid for from the parties' joint account.

The court valued Solveig's separate property at $2,216,186, Daniel's separate property at $16,000, and the parties' community property at $693,466. The court awarded the parties their separate properties and awarded Daniel 65 percent of the community property. Daniel appealed this property award.

ANALYSIS

A.     PROPERTY CHARACTERIZATION

Daniel assigns error to the trial court's characterization of the Ford and Clayton[4]

properties as Solveig's separate property.  He argues the trial court misconstrued *Borghi*.

We disagree.

We begin by reviewing the applicable standards of review.  The characterization of

marital property is a mixed question of law and fact.  *In re Marriage of Kile*, 186 Wn.

App. 864, 876, 347 P.3d 894 (2015).  We review factual findings supporting the trial

court's characterization for substantial evidence.  *Id.*; *In re Marriage of Schwarz*, 192

Wn. App. 180, 191-92, 368 P.3d 173 (2016).  For example, the time and method of

property acquisition, the intent of the donor, and whether a party rebuts the presumption

of community or separate property are questions of fact, reviewed for substantial

evidence.  *Schwarz*, 192 Wn. App. at 192; *Kile*, 186 Wn. App. at 876.  The ultimate

---

[4] Daniel fails to adequately argue why the trial court erred in classifying two of the Clayton property parcels as Solveig's separate property.  For this reason, we address only the trial court's characterization of the Ford property.  *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").  We however note that the analysis we use to affirm the Ford property's characterization would be equally applicable to the two Clayton parcels.

9

characterization of the property is a question of law, reviewed de novo. *Schwarz*, 192 Wn. App. at 192; *In re Marriage of Chumbley*, 150 Wn.2d 1, 5, 74 P.3d 129 (2003).

"[P]resumptions play a significant role in determining the character of property as separate or community." *Borghi*, 167 Wn.2d at 483. Property acquired during marriage is presumed to be community property, regardless of how title is held. *Dean v. Lehman*, 143 Wn.2d 12, 19, 18 P.3d 523 (2001). A party challenging a property's characterization as community bears the burden of rebutting the presumption, which can be overcome only by clear and convincing evidence. *Id.* at 19-20.

Separate property is property owned by a spouse before marriage or acquired after marriage "by gift, bequest, devise, descent, or inheritance, with the rents, issues and profits thereof." RCW 26.16.010. "Separate property brought into the marriage will retain its separate character as long as it can be traced or identified." *In re Marriage of Tulleners*, 11 Wn. App. 2d 358, 368, 453 P.3d 996 (2019).

Here, it is undisputed that the Ford property was acquired during the marriage. Thus, the presumption of community property applies. To rebut this presumption, Solveig needed to provide clear and convincing evidence that the funds used to purchase the Ford property came from her separate property and were traceable to the Ford purchase.

### 1.    *Funds used came from Solveig's separate property*

The trial court found that the funds used to purchase the Ford property came from Solveig's separate estate.  This finding is quoted at length above and we do not restate it here.  Daniel has not challenged this finding nor does he argue the trial court failed to apply the proper clear and convincing standard.  Rather, he challenges the trial court's legal conclusion that the joint title gift presumption does not apply here.

#### *Estate of Borghi*

In *Borghi*, the wife entered into a real estate purchasing contract before marriage. 167 Wn.2d at 482.  A few months after marriage, the contract seller issued a fulfillment deed in the names of the husband and wife.  *Id.*  When the wife died intestate, her son from a prior marriage sought rights to that property.  *Id.* at 482-83.

After recognizing that the property was presumed separate because it was acquired before marriage, the Supreme Court discussed and rejected the joint title gift presumption. That rule, which arises when title to a spouse's separate property changes to include both spouses' names, presumes the spouse intended to gift the property to the community.  *Id.* at 484-85.  The court explained:

> [E]ven when a spouse's name is included on a deed or title at the direction
> of the separate property owner spouse, this does not evidence an intent to
> transmute separate property into community property but merely an intent to
> put both spouses' names on the deed or title.  There are many reasons it may

> make good business sense for spouses to create joint title that have nothing to do with the intent to create community property. Allowing a presumption to arise from a change in the form of title inappropriately shifts attention away from the relevant question of whether a gift of separate property to the community is intended and asks instead the irrelevant question of whether there was an intent to make a conveyance into joint title.

*Id.* at 489 (citations omitted).

Daniel argues *Borghi* does not control because the Ford property was always titled in both his and Solveig's names. He asserts that *Borghi* did not overrule the joint title gift presumption for property acquired after marriage and titled in both spouses' names. We disagree. The *Borghi* court's disapproval of the joint title gift presumption did not rest on whether the property was acquired before or after marriage. The court instead discussed the inherent problems with relying on title alone to determine intent. As that court explained, "We have consistently refused to recognize any presumption arising from placing legal title in both spouses' names and instead adhered to the principle that the name on the deed or title does not determine the separate or community character of the property, or even provide much evidence." *Id.* at 488. Indeed, there are many reasons for spouses to create joint title. This proposition is illustrated here: Solveig had no credit and the community needed to secure a loan. To satisfy the lender's requirements, Solveig created joint title for the Arlington property.

12

*Marriage of Skarbek*

Daniel argues *In re Marriage of Skarbek*, 100 Wn. App. 444, 997 P.2d 447 (2000), controls. We disagree. There, the husband deposited separate funds into a joint bank account, and the trial court classified those funds as community property. *Id.* at 446. This court reversed, concluding the trial court erred in characterizing the funds as community when the husband traced and identified them at trial. *Id.* We reasoned, "The name under which property is held does not constitute direct and positive evidence determinative of whether the property is community or separate." *Id.* at 448.

*Skarbek* was decided nine years before *Borghi*. It recognized the joint title gift presumption but found it inapplicable due to the nature of the property and the traceability of the funds. Daniel relies on one line: "The Skarbeks are fighting over money, not bank accounts. The transaction here is not the same as buying stocks or bond or land. . . . If Mr. Skarbek had spent his money on an unrelated asset and put that asset in Ms. Skarbek's name, the rebuttable presumption would have attached." *Id.* at 450. We do not find this citation convincing. Importantly, *Borghi* disapproves of the joint title gift presumption discussed therein.

13

We conclude the trial court did not err by refusing to apply the joint title gift presumption to the Ford property. *Borghi* makes clear that the presumption no longer applies in Washington.

2.      *Funds used were traceable to Solveig's separate property*

Daniel notes that funds from the parties' Bank of America joint account were used for 13 months to purchase the Ford property. He argues that commingling of community (Bank of America) funds with Solveig's separate property requires the Ford property to be characterized as community property. We disagree.

In *Schwarz*, we discussed the commingling doctrine:

> "Commingling" of separate and community funds may give rise to a presumption that all are community property. This is not commingling in the ordinary sense, however; it must be hopeless commingling. Unlike the foregoing presumptions, this one is conclusive, arising only after the effort at tracing proves impossible. Only if community and separate funds are so commingled that they may not be distinguished or apportioned is the entire amount rendered community property. If the sources of the deposits can be traced and identified, the separate identify of the funds is preserved.

192 Wn. App. at 190-91 (internal quotation marks, citations, and footnotes omitted).

Commingling occurs only when a substantial amount of community property is intermixed with a substantial amount of separate property. *In re Marriage of Shui*, 132 Wn. App. 568, 584, 125 P.3d 180 (2005) (quoting 19 KENNETH W. WEBER,

14

WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 11.13, at 159-60

(1997)).

Here, the parties purchased the Ford property by paying over $37,000[5] from their

Bank of America joint account and later paying over $400,000 from Solveig's separate

property. With respect to the mortgage payments, the trial court reviewed tax and bank

records and found that the source of the payments was Solveig's separate property.

Daniel has not assigned error to this finding, so it is a verity on appeal. *Robel v. Roundup

Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002). Because all or substantially all of the

money used to purchase the Ford property came from Solveig's separate property and

because the payments are generally traceable to Solveig's separate property, the trial court

did not err in characterizing the Ford property as Solveig's separate property.

But even if the trial court's characterization of the Ford property was error, for us

to reverse, Daniel must prove that the characterization significantly influenced the

property division or that the distribution was unfair and inequitable.

An appellate court rarely reverses a trial court's property distribution on the

grounds that property was mischaracterized. *In re Marriage of Zier*, 136 Wn. App. 40,

46, 147 P.3d 624 (2006). We are reluctant to revisit the trial court's characterization of

---

[5] $2,877 x 13 months = $37,401.

property when the distribution is otherwise just and equitable. *In re Marriage of Farmer*, 172 Wn.2d 616, 631, 259 P.3d 256 (2011). We remand based on mischaracterization if: (1) the trial court indicates the distribution was significantly influenced by the property's characterization, and (2) it is unclear that the court would have divided the property that way had it been properly characterized. *In re Marriage of Shannon*, 55 Wn. App. 137, 142, 777 P.2d 8 (1989); *see also In re Marriage of Langham*, 153 Wn.2d 553, 563 n.7, 106 P.3d 212 (2005) (remand necessary only if property characterization was crucial to distribution).

Here, the court acknowledged that the characterization of the property was only one factor to consider, and stated, "Another just as important factor is the court's requirement to use its broad discretion to divide such property equitably and in doing so may consider the source of funds for the parties' acquisitions." CP at 193.

Courts look to many factors when making distributions, including "(1) [t]he nature and extent of the community property" and "[t]he nature and extent of the separate property." RCW 26.09.080(1), (2). The source or origin of funds used to acquire community property may be considered. *In re Marriage of Nuss*, 65 Wn. App. 334, 341, 828 P.2d 627 (1992). We recently recognized a trial court's discretion to award a disparate share of community funds where the origin of such funds is separate property.

16

*Tulleners*, 11 Wn. App. 2d at 370-71. Here, the Ford property was completely or substantially paid for with Solveig's separate property. Thus, even if the trial court mischaracterized the Ford property and it was indeed community property as Daniel contends, the court was well within its discretion to award a disparate proportion of the Ford property to Solveig.

B.   EXTRINSIC EVIDENCE: ARLINGTON PROPERTY

Daniel contends the trial court erred in permitting extrinsic evidence about Solveig's intent when she quitclaimed the Arlington property to herself and Daniel. Solveig responds that Daniel has not preserved this error. She further asserts that the parol evidence rule does not apply in this context. We agree with Solveig on both points.

In general, an appellate court will not address an error raised for the first time on appeal. RAP 2.5(a). We nevertheless exercise our discretion and address Daniel's argument. Washington follows the objective manifestation theory of contract interpretation. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id.* If the objective manifestation theory does not help us determine the parties' intent, we apply the "context rule." *Berg v. Hudesman*, 115 Wn.2d

657, 667, 801 P.2d 222 (1990). This rule permits us to consider extrinsic evidence as to the circumstances under which the contract formed to aid in ascertaining the parties' intent. *Id.*; *see also Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 189, 840 P.2d 851 (1992) (explaining that extrinsic evidence may be used to "illuminate[ ] what was written, not what was intended to be written"). We do not consider extrinsic evidence that contradicts the plain language of an unambiguous agreement. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999).

Although Daniel correctly cites our state's contract interpretation law, he misapplies it to this case. The quitclaim deed unambiguously transferred title from Solveig to the community, and the trial court did not permit extrinsic evidence to contradict that fact. Rather, extrinsic evidence was admitted to ascertain whether Solveig intended to *transmute* her share of Arlington permanently from her separate property to the community with that quitclaim. Extrinsic evidence is permissible on this question. *Scott v. Currie*, 7 Wn.2d 301, 308, 109 P.2d 526 (1941) (approving admission of parol evidence to establish grantor's intent); *see also Borghi*, 167 Wn.2d at 488-89 (distinguishing intent to transmute property from interpretation of deed). Solveig testified that she did not intend to transmute the property, and Ms. Pedersen testified that the lender required Daniel on the Arlington deed. *See* Ex. R-158 (Loan Closing Instructions,

Specific Conditions 1 and 16). This testimony was not offered to interpret the deed itself, but rather to explain the circumstances under which the deed was signed. It supports Solveig's claim that she did not intend to permanently gift her inheritance to the community.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Pennell, C.J.          Fearing, J.

19